UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-20518-CR-MARTINEZ/AOR

UNITED STATES OF AMERICA,

v.

EUGENE HILTON RUSSELL,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant Eugene Hilton Russell's ("Defendant" or "Russell") Motion to Suppress Statements (hereafter, "Motion to Suppress") [D.E. 11]. This matter was referred to the undersigned by the Honorable Jose E. Martinez, United States District Judge, pursuant to Title 28, United States Code, Section 636 [D.E. 12]. The undersigned held an evidentiary hearing on this matter on October 4, 2018 [D.E. 26]. For the reasons stated below, the undersigned respectfully recommends that Russell's Motion to Suppress be GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

On June 15, 2018, Russell was charged by way of Indictment with the following offenses:

Count 1:    Importation of a Controlled Substance, on June 2, 2018, in violation of 21 U.S.C. § 952(a).

Count 2:    Possession with Intent to Distribute a Controlled Substance, on June 2, 2018, in violation of 21 U.S.C. § 841(a)(1).

See Indictment [D.E. 5].

On June 2, 2018, U.S. Customs and Border Protection ("CBP") agents intercepted Russell's vessel about 5 nautical miles east of Key Biscayne, Florida. During the encounter, law enforcement asked Russell where he was coming from, where he was heading, and how far out he had gone. Russell seeks to suppress his answers to those questions, on the grounds that law enforcement obtained them without giving him prior Miranda warnings.[1]

## APPLICABLE LAW

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, cl. 2. In Miranda v. Arizona, the United States Supreme Court held that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." 384 U.S. 436, 467-68 (1966). "Once warnings have been given . . . [i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. The Miranda Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004). The requirement that Miranda warnings be given also applies to aliens at the border who are subjected to custodial interrogation. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) (citations omitted).

A person is in custody for Miranda purposes only "when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006). Whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a

---

[1] Although Russell was also asked about his citizenship, he does not seek to suppress his response to that question.

2

restraint on his freedom of movement to such extent that he would not feel free to leave." United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001). The test is objective, and the actual, subjective beliefs of the defendant and the interviewing agent on whether the defendant was free to leave are irrelevant. Moya, 74 F.3d at 1119 (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).

Whether interrogation is "custodial" should be interpreted in the light of the strong governmental interest in controlling the borders. Id. (citing United States v. Lueck, 678 F.2d 895, 899 (11th Cir. 1982)). "Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States." Lueck, 678 F.2d at 899. The Eleventh Circuit has held that "questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." Moya, 74 F.3d at 1120 (internal citations and quotations omitted). Among the factors the Eleventh Circuit considered in determining custodial interrogation at the border included whether: (1) the defendant was physically moved or restrained; (2) handcuffs were employed; (3) guns were drawn; (4) the defendant was booked, told of formal accusations, or told that he was under arrest; (5) the defendant asked to leave and was told he could not do so; or (6) the defendant made any admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately. Id. at 1119. Several courts in this district have emphasized that a lack of handcuffing or physical restraint indicates that the questioning at the border was not custodial, hence Miranda warnings were not required. See, e.g., United States v. Senese, No. 18-CR-60076, 2018 WL 3159733, at *9 (S.D. Fla. June 28, 2018) ("At no point did the agents

3

physically restrain Defendant, draw their weapons, employ handcuffs, place Defendant under arrest, accuse him of drug smuggling, or inform him that he was not free to leave."); United States v. Vallerius, No. 17-CR-20648, 2018 WL 2325729, at *4 (S.D. Fla. May 1, 2018), report and recommendation adopted, No. 17-20648-CR, 2018 WL 2324059 (S.D. Fla. May 22, 2018) (noting that the defendant "had not been restrained or moved" at the time he answered the agent's question and that the agent "had not placed Defendant in handcuffs, no guns were drawn at the time [Defendant] provided the information, and Defendant never asked to leave the secondary inspection area"); United States v. Ortega, No. 12-20580-CR, 2012 WL 12894242, at *4 (S.D. Fla. Dec. 3, 2012) (finding that the defendant "was not restrained, not handcuffed, not arrested or threatened with arrest" in determining that there was no custodial interrogation); United States v. Fontane-Medina, No. 11-20492-CR, 2011 WL 6826811, at *14 (S.D. Fla. Nov. 27, 2011), report and recommendation adopted, No. 11-20492-CR, 2011 WL 6826724 (S.D. Fla. Dec. 28, 2011) (finding that, during the questioning, "the freedom of movement of the Defendant was not restrained to the degree associated with an arrest; thus, the Defendant was not in custody and *Miranda* warnings were not required prior to questioning").

The special procedural safeguards outlined in Miranda are required when a suspect in custody is subjected to interrogation. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). An act of interrogation encompasses "any words or actions" on the part of law enforcement agents that they should know are "reasonably likely to elicit an incriminating response." Id. at 301. Law enforcement may not use routine questioning as a guise for obtaining incriminating information. United States v. Glen-Archila, 677 F.2d 809, 816 n.18 (11th Cir. 1982). See also United States v. Ramirez, 991 F. Supp. 2d 1258, 1266 (S.D. Fla. 2014) (holding that the response to a question about how long the defendant had lived at the residence being searched was inadmissible). Even

4

questions that usually are routine must be preceded by Miranda warnings if they are intended to produce incriminating answers. Glen-Archila, 677 F.2d at 816 n.18.

## FINDINGS OF FACT

### I. Testimonial and documentary evidence

1. The following witnesses testified at the October 4, 2018 evidentiary hearing: CBP Agent Alex Mendez ("Agent Mendez") and CBP Agent David Dawson ("Agent Dawson").

2. The following item was admitted into evidence: Government's Exhibit 2.

### II. Facts

#### A. *Agent Mendez*

3. Agent Mendez is a Marine Interdiction Agent who has been assigned to the Miami Marine Unit of the CBP's Miami Air and Marine Branch since January 2015.

4. As a Marine Interdiction Agent, Agent Mendez's everyday operations included patrolling U.S. customs waters, which encompass the area from the shoreline out to 12 nautical miles, and interdicting and boarding any vessels coming into the United States.

5. According to Agent Mendez, an interdiction is a stop of a vessel that is inbound to the United States from a foreign country or foreign waters. A stop of a vessel in customs waters usually includes a boarding of the vessel.

6. During a routine boarding, agents will ask a series of questions and examine the documentation for the vessel and the operator. Most boardings are routine.

7. Some questions that are routinely asked during a vessel boarding are: where the operator is coming from; where the operator is going; how many people are on board; the operator's citizenship; and how far out at sea the operator was.

5

8.      According to Agent Mendez, CBP agents are not required to give Miranda warnings prior to asking those types of routine boarding questions.

9.      On June 2, 2018, Agent Mendez was notified by agents on a CBP aircraft (hereafter, the "Air Unit") that they were monitoring a vessel that was transiting from Bahamian waters towards the United States.

10.     The Air Unit had observed the vessel come together with another vessel in Bahamian waters.

11.     After receiving that notification, Agent Mendez and other agents in the Miami Marine Unit met up with the Fort Lauderdale Marine Unit and created a plan to intercept the vessel and conduct a routine boarding.

12.     Based on the information given by the Air Unit, the agents were able to determine that the vessel would be heading into the Key Biscayne channel. After identifying the vessel approximately 5 ½ to 6 miles offshore from Key Biscayne, Agent Mendez confirmed with the Air Unit that the vessel he was looking at was the same vessel that they had been monitoring from the Bahamian waters.

13.     Once the agents started approaching the vessel, it completely turned around and started heading eastbound back towards Bahamian waters. As the agents continued to approach the vessel, it maintained speed and kept going away from them.

14.     At that point, the agents activated their flashing blue lights and sirens. Russell, who was operating the vessel, did not stop the boat. Agent Mendez saw Russell turn around and look at the CBP boats as they approached him, but then he continued to evade them.

15.     Agent Mendez grabbed his rifle to take the position of a cover agent, which is the person that gives cover to the other agents on the CBP boat and protects them for safety reasons.

16. Another agent grabbed a shotgun, which would be utilized to disable the vessel's engine, if necessary, or to deploy warning rounds in all attempts to have the vessel stop.

17. When the CBP boats got close enough to the vessel, Agent Mendez was able to yell to Russell and instruct him to stop and put his hands on his head. Russell stopped the vessel, although not immediately.

18. Once Russell stopped, the CBP boats came alongside the vessel. Upon approaching the vessel, Agent Mendez pointed the rifle at Russell. Agent Mendez continued to command Russell to put his hands above his head and not to move.

19. Agent Kane Sprague ("Agent Sprague") and Agent Dawson boarded the vessel, and Agent Mendez lowered his rifle.

20. Agent Sprague was able to secure Russell by placing him in handcuffs for safety reasons, and then he conducted a quick pat-down search of Russell.

21. Agent Dawson then confirmed that there was nobody else on the vessel and that the vessel was safe.

22. Agent Mendez continued to have the rifle out, but did not draw his sidearm. He was not sure if any other agents had their service weapons drawn.

23. Once the vessel was safe, Agent Mendez shouted to Russell and asked where he was coming from and where he was going. Russell responded that he was coming from Miami and going back to Black Point Marina in Miami.

24. Agent Mendez then asked Russell how far out he had gone, to which Russell responded that he had been out 12-13 nautical miles from shore.

25. Upon cross-examination, Agent Mendez stated that he already knew the answers to these questions for the most part because he had been in contact with the Air Unit that had been conducting surveillance of Russell's vessel.

26. Russell was not given Miranda warnings before Agent Mendez asked these questions.

27. During the questioning, Russell was still handcuffed and Agent Mendez still had his rifle out.

28. The boarding team told Agent Mendez that everything on the vessel was safe and they requested a life jacket for Russell. At that point, Agent Mendez put away his rifle.

29. For Russell's safety, he was transferred to the CBP boat and transported to the Coast Guard station in Miami while Agent Sprague drove Russell's boat to the station.

30. During that transport, Agent Mendez reviewed Russell's vessel documentation and identification, which had been recovered from the vessel.

31. At the time of the interdiction, the Air Unit had been tracking Russell's vessel for about two hours. The Air Unit videotaped: Russell's vessel alongside another vessel in Bahamian waters; Russell's transit from Bahamian waters to the United States; and CBP's interdiction and boarding of Russell's vessel.

32. According to Agent Mendez, if a vessel immediately stops once the agents put on the blue lights, the agents do not draw their rifle or shotgun and they do not usually handcuff the operator.

33. Agent Mendez further testified that, during a routine boarding, he would not have his rifle out; there would not be an agent with a shotgun ready to disable the motor; and the subject would not be handcuffed.

34. On re-direct examination, Agent Mendez testified that this was not a routine boarding because Russell turned around and was evading law enforcement as they approached him.

35. The undersigned found Agent Mendez's testimony to be credible.

**B. *Agent Dawson***

36. Agent Dawson works in CBP's Miami Marine Unit as a Marine Interdiction Agent.

37. On June 2, 2018, he participated in the interdiction and boarding of Russell's boat off the coast of Key Biscayne.

38. The Miami Marine Unit was in constant contact with the Air Unit that had been monitoring Russell. The Air Unit kept the Miami Marine Unit apprised of Russell's movements and location.

39. The Air Unit had observed Russell's vessel and another vessel meet in open water in an area that was known for illegal narcotics trafficking. Agent Dawson was aware of this fact at the time of the interdiction.

40. It was Agent Dawson's understanding that the Air Unit had been tracking Russell since his vessel left Bahamian waters.

41. When the two CBP boats pulled up on both sides of Russell's boat, Agent Dawson had a shotgun in case he had to fire off a warning shot or take out the engine.

42. Agent Dawson did not carry that shotgun when he boarded Russell's vessel, but there was an agent who had a rifle for cover.

43. Agent Dawson recalled Russell being asked about his citizenship and place of birth, and that Russell stated that he was a U.S. citizen from Miami.

44. Agent Dawson also recalled that Russell was asked where he was going, where he was coming from, and how far off shore he had been. Russell responded that he was on his way to Black Point Marina in Miami and that he had been fishing about 13 miles off shore.

45. According to Agent Dawson, the questions asked of Russell were just standard boarding questions that CBP agents ask to get an idea of what they are dealing with, and that Miranda warnings are not required before asking them.

46. Upon re-direct examination, Agent Dawson testified that Russell was not placed under arrest at any point during the boarding.

47. The undersigned found Agent Dawson's testimony to be credible.

### C. Air Unit Video[2]

48. During his testimony, Agent Mendez reviewed the Air Unit's surveillance video of Russell's vessel.

49. The Air Unit observed Russell's vessel heading westbound off the shore of Key Biscayne. See Gov't Ex. 2 at 00:10.[3]

50. Two CBP boats began approaching Russell's vessel from behind. Id. at 00:50.

51. Russell stepped away from the throttle system and the steering wheel while the vessel maintained a high rate of speed. Id. at 01:10.

52. Russell looked in the direction of the two CBP boats, then returned to the driver's seat. Id. at 01:20-01:23. He looked back towards the CBP boats three more times, while continuing to maintain a high rate of speed. Id. at 01:24-01:34.

53. Russell then began turning the vessel around and looked back towards the CBP boats once more. Id. at 01:44-01:50.

---

[2] The undersigned bases these factual findings on her independent review of the video and Agent Mendez's testimony about what was depicted in the video.
[3] The citations to Gov't Ex. 2 reflect the time stamp of the video.

54. The CBP boats caught up to Russell's vessel and their lights were flashing. Id. at 02:30.

55. Russell stopped his vessel and the Miami Marine Unit's boat pulled up along the starboard side of his boat. Id. at 02:40. The Fort Lauderdale Marine Unit's boat pulled up along the port side of Russell's boat. Id. at 02:46.

56. Russell, while still sitting in the driver's seat, put his hands on his head. Id. at 03:03.

57. The Miami Marine Unit came closer to Russell's boat and Agent Mendez had his rifle pointed at Russell. Id. at 03:16. As Agent Mendez had his rifle pointed at Russell, he instructed Russell to keep his hands visible. Id. at 03:16-03:20.

58. Agent Sprague boarded Russell's vessel and immediately grabbed Russell's hands and put his arms behind his back, handcuffing him. Id. at 03:32-03:36.

59. Agent Dawson then boarded Russell's vessel, and Agent Mendez pulled his rifle away from Russell's direction. Id. at 03:36-03:38. Agent Mendez then resumed pointing the rifle at Russell. Id. at 03:48.

60. While Agent Sprague continued handcuffing Russell, Agent Dawson appeared to be searching the area immediately next to Russell. Id. at 03:52-04:06. At this point, Agent Mendez began shouting to Russell the questions at issue. Id. at 04:13.

61. Agent Sprague and Agent Dawson then lifted Russell to his feet and out of the driver's seat. Id. at 04:28. Agent Sprague bent Russell over the front of the vessel in a facedown position and conducted a pat-down search. Id. at 04:34-04:57. During the pat-down search, Agent Mendez had his rifle pointed towards the vessel, but not pointed directly at Russell. Id.

11

62. Agent Sprague asked Agent Mendez to get a life jacket for Russell. Id. at 05:10-05:18.

63. From the time Agent Sprague completed the pat-down search to the conclusion of the video, Agent Sprague had his hand on Russell's back, keeping Russell in the same facedown position with his arms handcuffed behind his back. Id. at 04:57-06:03.

## CONCLUSIONS OF LAW

Russell seeks to suppress his responses to the following questions asked by Agent Mendez during the interdiction and boarding: where he was coming from, where he was heading, and how far out he had gone. Based on the foregoing factual findings and legal authorities, the undersigned concludes as follows.

*First.* *The totality of the circumstances demonstrates that Russell was in custody at the time that Agent Mendez questioned him.* It is undisputed that Russell was handcuffed prior to being questioned. Agent Sprague then held Russell facedown over the front of his boat and conducted a pat-down search. Moreover, Agent Mendez shouted the questions at Russell while pointing a rifle at him. Thus, the following three factors set forth by the Eleventh Circuit in Moya were satisfied: (1) the defendant was physically moved or restrained; (2) handcuffs were employed; and (3) guns were drawn. Moya, 74 F.3d at 1119. On these facts, plus being at sea, a reasonable man in Russell's position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave. McDowell, 250 F.3d at 1362.

The government argues that the use of the rifle and the handcuffing of Russell were necessary and reasonable safety measures that "should not curtail the authority of customs agents to ask the type of routine questions that they are allowed to ask during a border stop." See Response [D.E. 19 at 11]. However, whether these safety measures were necessary or

12

reasonable is irrelevant to the inquiry of whether Russell was in custody. Given that several courts have emphasized the lack of handcuffing or physical restraint in concluding that questioning at the border was not custodial for purposes of Miranda, the undersigned finds that the handcuffing and physical restraint of Russell in this case is particularly indicative of custodial interrogation. Compare Senese, 2018 WL 3159733, at *9; Vallerius, 2018 WL 2325729, at *4; Ortega, 2012 WL 12894242, at *4; Fontane-Medina, 2011 WL 6826811, at *14.

*Second.* *In this context, the questions asked by Agent Mendez were not routine, but rather were intended to elicit an incriminating response.* The government contends that the questions asked of Russell were routine border inspection questions comparable to those asked during typical arrivals into the United States. See Response [D.E. 19 at 9-10]. However, routine border inspections do not include the restraint on freedom of movement that Russell experienced, as discussed above. Furthermore, as Agent Dawson explained, the purpose of routine questions is to give CBP agents an idea of what they are dealing with. By the time the CBP boats approached Russell, the Air Unit had been tracking Russell's movements for approximately two hours. They had captured on videotape Russell's meeting with another vessel in open water in an area that was known for illegal narcotics trafficking, and they continued to track him until CBP boarded his vessel. The Miami Marine Unit was in constant contact with the Air Unit and was kept apprised of Russell's movements and location. Consequently, as Agent Mendez admitted on the stand, he already knew the answers to the questions at issue based on the information he had received from the Air Unit.

Thus, although the undersigned finds credible Agent Mendez and Agent Dawson's testimony that the questions asked of Russell were routine questions typically asked during interdictions and boardings, the circumstances of this case demonstrate that Agent Mendez

13

should have known that, in these circumstances, the questions would be "reasonably likely to elicit an incriminating response." See Innis, 446 U.S. at 301; Glen-Archila, 677 F.2d at 816 n.18. Indeed, Agent Mendez acknowledged that this was not a routine boarding, and his prior knowledge of the vessel's whereabouts establishes that he *did* know the potential for incriminating responses. Either Russell was going to answer truthfully and thus confirm his whereabouts, or he was going to lie to law enforcement. Both scenarios would provide the agents with incriminating information under the guise of routine questioning. See Glen-Archila, 677 F.2d at 816 n.18.

Therefore, the questioning rose to a distinctly accusatory level for which Miranda warnings were required. See Moya, 74 F.3d at 1120.

Because Miranda warnings were not given to Russell prior to asking him where he was coming from, where he was heading, and how far out he had gone, Russell's responses to those questions must be suppressed. Seibert, 542 U.S. at 608.

## **RECOMMENDATION**

In accordance with the foregoing, the undersigned respectfully recommends that Russell's Motion to Suppress [D.E. 11] be GRANTED. Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez. Failure to timely file objections shall bar the parties from attacking on appeal the factual findings contained herein. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Miami, Florida this 31st day of October, 2018.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: United States District Judge Jose E. Martinez
     Counsel of Record